**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**NATIONAL ASSOCIATION OF STUDENT
LOAN ADMINISTRATORS,**

        Plaintiff,

v.

Civil Action No. _3:21cv440_____

**E. JOSEPH FACE, JR., Commissioner of
Financial Institutions, Bureau of Financial
Institutions, Virginia State Corporation
Commission; JEHMAL T. HUDSON,
Commissioner, Virginia State Corporation
Commission; JUDITH WILLIAMS JAGDMANN,
Commissioner, Virginia State Corporation
Commission; and ANGELA L. NAVARRO,
Commissioner, Virginia State Corporation Commission,**

        Defendants.

## COMPLAINT

Plaintiff, National Association of Student Loan Administrators ("NASLA"), by and

through undersigned counsel, states for its Complaint as follows:

## INTRODUCTION

1.     This lawsuit concerns the Commonwealth of Virginia's ("Virginia") attempt to

enforce a licensure law aimed at servicers of student loans ("Servicers") on federal student loan

guarantors ("Federal Guarantors").

2.     Federal Guarantors play a vital role in the administration of one of the two main

federal student loan programs: the Federal Family Education Loan ("FFEL") Program.

3.      Pursuant to the Higher Education Act of 1965 (the "HEA"), Congress created the role of Federal Guarantors to help the U.S. Department of Education ("ED") administer the FFEL Program by, among other things, performing supplemental default-aversion services to borrowers before loans default; evaluating whether FFEL lenders satisfied due-diligence requirements before paying claims and assuming loans issued pursuant to the FFEL Program ("FFELP Loans"); and paying FFEL lenders' claims and taking over FFELP Loans as ED's fiduciary when certain statutorily-defined conditions are met.

4.      In addition to these default-aversion and related activities, Federal Guarantors engage in a variety of college-access and financial-literacy initiatives all aimed at furthering the HEA's goal of increasing access and success to postsecondary education.

5.      Importantly, Federal Guarantors do not engage in loan servicing: they do not accept payments, apply payments, maintain a servicing system, or have access to the servicing system during a loan's repayment period or even any delinquency period.  Rather, Servicers perform these activities.

6.      Recently, and ostensibly motivated by dissatisfaction with the federal government's regulation of those servicing student loans, 26 states (including the District of Columbia)[1] have passed or are considering licensure laws designed specifically to regulate Servicers, who play a distinct role in the federal student loan programs from Federal Guarantors.

---

[1] Arizona, California, Colorado, Connecticut, District of Columbia, Illinois, Kentucky, Maine, Maryland, Minnesota, Montana, New Jersey, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oklahoma, Oregon, Rhode Island, South Carolina, Texas, Virginia, Vermont, Washington and Wisconsin.

7.     Federal Guarantors do not service student loans, and many of these laws impose a series of requirements that are preempted by federal law governing Federal Guarantors and therefore cannot be legally applied to them.

8.     As a result, the overwhelming majority of states and the District of Columbia have declined to apply their respective servicing laws to Federal Guarantors.

9.     States have excluded Federal Guarantors from their servicing licensure schemes by: (1) narrowly tailoring the definition of servicing to traditional servicing activity (e.g., Connecticut, District of Columbia, and New Jersey);[2] (2) expressly exempting guaranty agencies (e.g., California, Illinois, and Washington);[3] (3) interpreting default prevention as applied to guaranty agencies to not constitute "servicing" (e.g., New York);[4] or (4) forbearing from enforcement of its servicing law and regulations against Federal Guarantors (e.g., Colorado).[5]

10.    Virginia has declined to follow these states' lead, despite outreach by NASLA and one of its members (Educational Credit Management Corporation ("ECMC"), Virginia's designated guarantor), forcing Federal Guarantors to bring this action.

11.    In 2020, Virginia passed House Bill 10 and Senate Bill 77, entitled Qualified Education Loan Servicers Act, to create Chapter 26 of Title 6.2 of the Code of Virginia ("the Act"). *See* Va. Code. Ann. § 6.2-2600, *et seq.*

---

[2] Conn. Gen. Stat. § 36a-846(3); D.C. Code § 31-101(11); N.J. Stat. Ann. § 17:16ZZ-1.

[3] Cal. Fin. Code § 28102(b)(6); 110 Ill. Comp. Stat. 992/1-5; Wash. Rev. Code § 31.04.420(1)(c).

[4] N.Y. Banking Law § 710(7); N.Y. Comp. Codes R. & Regs. Tit. 3, § 409.

[5] Colo. Rev. Stat. §§ 5-20-101 to -119 (2020); 4 Colo. Code Regs. § 902-3 (2020).

12.     The Act, which became effective July 1, 2021, imposes registration, licensing, and oversight requirements on companies engaged in the "servicing" of student loans in Virginia.

13.     However, the Act's definitions of "servicing," "qualified education loan servicer," and "loan servicer" are broad enough to encompass Federal Guarantors' federally-mandated default-aversion and financial-wellness activities and require that they be licensed.

14.     Subsequently, the Bureau of Financial Institutions for the Commonwealth of Virginia (the "Bureau"), which is a division within the State Corporation Commission (the "Commission"), promulgated proposed regulations to implement the provisions in the Act.

15.     The Commission is expected to adopt the proposed regulations, with only minor changes.

16.     The regulations will not alter the definitions of or exempt Federal Guarantors from the substantive provisions in the Act.

17.     Rather, the regulations will require that licensees pay an annual licensing fee of $1,000 per licensee, plus $0.48 per qualified education loan "serviced" by the licensee; obtain surety bonds; and submit to broad regulatory oversight. 10 Va. Admin. Code §§ 5-220-20, 80.

18.     This lawsuit asks the Court to move swiftly to prevent the Commissioner of Financial Institutions for the Bureau (the "Commissioner") and the Commissioners for the Commission from applying the Act and its implementing regulations to Federal Guarantors to avoid both the significant cost and uncertainty the Act and its implementing regulations present for Federal Guarantors and the FFEL Program more generally.

19.     This lawsuit challenges the Act and its implementing regulations on the grounds that federal law preempts them and that Federal Guarantors are immune under the intergovernmental-immunity doctrine.

20.     Specifically, this lawsuit seeks a declaratory judgment that the Act and its implementing regulations: (1) violate the rule expressed in *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); (2) authorize improper searches and seizures under the Fourth and Fourteenth Amendments to the U.S. Constitution; and (3) cannot be applied to Federal Guarantors because they are immune under the intergovernmental-immunity doctrine, and are therefore invalid.

## **PARTIES**

21.     NASLA is a non-profit, 501(c)(6) membership-based organization with its principal office located at 2501 International Lane, Madison, Wisconsin 53704.  It was formed in 1998 to advocate for state and nonprofit Federal Guarantors through legislative, litigation, and other legal efforts, by representing their specific and unique interests in states across the United States.  NASLA educates policymakers, courts, and other interested stakeholders on the role of Federal Guarantors and the differences between Servicers and Federal Guarantors, especially as it relates to Federal Guarantors' default-aversion and financial-wellness services.  NASLA is particularly important in today's legislative and regulatory climate where Federal Guarantors face a rising tide of state laws apparently intended to regulate Servicers but that facially encompass Federal Guarantors' default-aversion and financial-wellness activities, jeopardizing their ability to fulfill their mandatory obligations under federal law.  NASLA's membership currently consists of five Federal Guarantors.

5

22.     Defendant E. Joseph Face, Jr.[6] is the Commissioner of Financial Institutions for the Bureau.  The Bureau is a regulatory division within the Commission.  The Bureau is involved in consumer protection through administration of Virginia's laws regarding depository and non-depository financial institutions.

23.     Defendants Jehmal T. Hudson, Judith Williams Jagdmann, and Angela L. Navarro are the current Commissioners for the Commission.  The Commission is a state agency with regulatory authority over many business and economic interests in Virginia, including public utilities, insurance, state-chartered financial institutions, securities, retail franchising, and railroads. The Commission is organized under the Constitution of Virginia as an independent department of the state government, with delegated administrative, legislative, and judicial powers.  The Act requires the Commission to adopt regulations to effectuate its purposes.  Ms. Jagdmann is the current chair for the Commission.

## STANDING

24.     NASLA has associational standing to bring this action because (1) its members have standing to sue on their own; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested may require the participation of individual members in the lawsuit.  *See, e.g.*, *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

25.     First, NASLA members have standing to sue on their own because they already have been harmed and will be imminently harmed by the imposition of the Act and its implementing regulations, including the required annual licensing fees; the Commonwealth of

---

[6] The Defendants are sued in their official capacities.

Virginia passed the Act, and the Commission adopted the implementing regulations, and therefore caused the injury; and this Court has the power to redress the injury by invalidating the Act and its implementing regulations. *See United States v. Virginia*, 139 F.3d 984, 987 n.3 (4th Cir. 1998) ("Because the Virginia Attorney General has repeatedly informed the FBI that it believes that [federal background investigation contract services program ("BICS")] investigators are subject to its regulations and that it has the power to enforce those regulations against BICS investigators, we also agree with the district court that BICS investigators faced a reasonable threat of criminal prosecution and that there is thus a ripe case or controversy for this court to adjudicate.").

26.     Second, the Act and its implementing regulations directly affect the ability of NASLA's members to provide necessary services to borrowers (by cutting off funds necessary to do that) and administer the FFEL Program, both of which are goals of NASLA.

27.     Third, none of NASLA's members are required to participate in this lawsuit because this lawsuit merely seeks declaratory relief to invalidate the Act and its implementing regulations.

## JURISDICTION AND VENUE

28.     Jurisdiction is proper over NASLA's claims for relief pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

29.     Venue is proper in the U.S. District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1391 because the Defendants reside in this judicial district and the acts described in this Complaint occurred in this judicial district.

## GENERAL ALLEGATIONS

### *Federal Student Loans*

30.     The federal student loan industry is unique among loan industries in the United States.

31.     Federal student loans derive from government programs designed to provide greater access to higher education.

32.     The federal student loan programs are established in the HEA, which is administered by ED.

33.     Congress passed the HEA in 1965 to "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."  Higher Education Act, Pub L. No. 89-329, 79 Stat. 1219 (1965).

34.     Specifically, the HEA, which is codified at 20 U.S.C. §§ 1001, *et seq.*, was passed with the goal of "keep[ing] the college door open to all students of ability, regardless of socioeconomic background."  *Rowe v. Educ. Credit Mgmt. Corp*., 559 F.3d 1028, 1030 (9th Cir. 2009) (internal quotation marks omitted).

35.     To effectuate these goals, Congress has established two main federal student loan programs: the FFEL Program, 20 U.S.C. §§ 1071, *et seq*., and the William D. Ford Federal Direct Loan Program (the "Direct Loan Program"), 20 U.S.C. §§ 1087a, *et seq.*   Title IV of the HEA governs these federally funded student financial aid programs for college and post-secondary vocational training.  20 U.S.C. § 1070, *et seq*.

36.     Congress established both programs as entitlement programs.

37.     These federal loan programs have grown exponentially.  Outstanding federal student loans have almost tripled from less than $600 billion in 2008 to nearly $1.6 trillion today.

*See* Federal Student Aid Portfolio Summary, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xls.

38.      As of the second quarter of 2021, FFELP Loans constitute \$238.8 billion or approximately 15 percent of federal student loans. *See* Federal Student Aid Portfolio Summary, U.S. Dep't of Educ., *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/ library/PortfolioSummary.xls.   Loans issued pursuant to the Direct Loan Program ("Direct Loans") constitute approximately \$1.35 trillion or over 84 percent of federal student loans.[7] *Id.*

39.      In addition, pursuant to the Ensuring Continued Access to Student Loans Act of 2008 ("ECASLA"), H.R. 5715, 110th Cong. (2008) (enacted), ED purchased from private lenders approximately 3.91 million FFELP Loans, with an outstanding balance of over \$92 billion, that lenders originated from 2007 to 2010. *See* Statement of Interest by the United States, at n.3, *Commonwealth of Massachusetts v. Pennsylvania Higher Educ. Assistance Agency*, Case No. 1784CV02682 (Mass. Sup. Ct.).

40.      As of March 31, 2021, the average student loan borrower in the Commonwealth of Virginia had approximately \$39,500.00 in outstanding federal student debt.   Federal Student Aid, Federal Student Loan Portfolio by Borrower Location, *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/Portfolio-by-Location.xls. Given that the current borrowing limit for dependent undergraduates is \$31,000.00, this average likely reflects a high number of Virginia residents who have used student loans for graduate studies. *See* Jennifer Ma, et al., *Trends in College Pricing and Student Aid 2020*, College Board,

---

[7] The remaining fraction of a percentage of federal student loans come from Perkins Loans, which are loans made by some institutions to their neediest students using federal funds.

at 4, 31, *available at* https://research.collegeboard.org/pdf/trends-college-pricing-student-aid-2020.pdf (showing that the average borrowing in federal student loans for undergraduate studies in 2018-2019 was approximately $4,090 per student while the average for graduate studies was $17,470 per student).

41.    There is no credit check or test for ability to repay for students who want to participate in federal student loan programs.  The only criterion to take out a federal student loan is attendance at an institution of higher education that meets ED standards for participation. *See* 20 U.S.C. § 1091 (detailing student eligibility).

42.    Because of their importance in providing access to higher education, federal student loans provide federal taxpayer-funded benefits to borrowers that are not found in other consumer loans.  These benefits include below-market interest rates; subsidized loans, where the federal government pays accruing interest during certain periods, for borrowers who demonstrate financial need; generous forgiveness and discharge provisions; and income-based repayment and forgiveness. *See* 20 U.S.C. §§ 1071 to 1087vv (stating the benefits of the federal student loan programs).

### *FFEL Program*

43.    Congress authorized the FFEL Program, which was originally known as the Guaranteed Student Loan Program, as part of the HEA in 1965.[8]

---

[8] In contrast, Congress first authorized the Direct Loan Program as a pilot program as part of the Higher Education Amendments of 1992.  Congress then fully authorized this program through the Student Loan Reform Act of 1993, as part of the Omnibus Reconciliation Act of 1993.

44.     The FFEL Program has helped millions of students pursue a higher education

without the collateral or credit history necessary to borrow money in traditional lending markets.

45.     The FFEL Program helps borrowers obtain loans through a two-tiered insurance

model.  FFELP Loans are loans that were made by banks and other private lenders, insured by

Federal Guarantors, and then reinsured by the federal government.[9]  *See* 20 U.S.C. §§ 1071, *et*

*seq.*; 34 C.F.R. §§ 682.100, 682.404  Specifically, the model works as follows:

- Private lenders make FFELP Loans without traditional underwriting requirements;

- Federal Guarantors insure lenders and purchase defaulted loans, as a fiduciary of the federal government, if lenders have satisfied certain statutory and regulatory due-diligence requirements; and

- ED reinsures guarantors and takes over "uncured" defaulted FFELP Loans if the Federal Guarantors have satisfied their own set of statutory and regulatory due diligence requirements.

46.     As a result, entitlements under the FFEL Program accrue to lenders and Federal

Guarantors, as well as to individual borrowers.

47.     Like all other federal student loan programs, the FFEL Program is highly

regulated by the federal government.

48.     As to the FFEL Program in particular, Congress granted the Secretary of

Education and ED broad authority to: (1) prescribe regulations, including regulations pertaining to

Servicers of federal student loans; (2) audit financial transactions of, impose civil penalties

against, and limit, suspend, or terminate the participation of lenders and guaranty agencies; and

---

[9] In contrast to FFELP Loans, Direct Loans are made by and owned by the federal government.  As a result, entitlements under the Direct Loan Program accrue to individual borrowers, and there is no need for Federal Guarantors.

(3) promulgate standardized forms and procedures covering "all aspects of the loan process," including common application forms, promissory notes, and master promissory notes. 20 U.S.C. § 1082(a), (f), (g), (h), (l), and (m).

49.     ED has since adopted numerous regulations governing all aspects of FFELP Loans, including charges to borrowers, 34 C.F.R. § 682.202; repayment plans, 34 C.F.R. § 682.208; deferment and forbearance, 34 C.F.R. §§ 682.210–211; and due diligence in servicing a loan, 34 C.F.R. § 682.208.

50.     ED also has promulgated rules establishing the forms of promissory notes, borrower disclosures, and other forms that cannot be altered. *See* 20 U.S.C. §§ 1082(m)(1)-(4). "The purpose of the common forms is to standardize the terms and formatting to help applicants understand their loan obligations." *Chae v. SLM Corp.*, 593 F.3d 936, 940 (9th Cir. 2010) (citing 20 U.S.C. § 1082(m)(1)(B)).

51.     Overall, Congress intended for the FFEL Program to operate uniformly across the United States and that their "participants be held to clear, uniform standards." *See id.* at 944–47 (noting that "Congress created a policy of inter-program uniformity by requiring that 'loans made to borrowers [under the Direct Loan Program] shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers under [the FFEL Program].'" (quoting 20 U.S.C. § 1087e(a)(1))); *see also Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1266 (9th Cir. 1996) (holding that the FFEL Program "requires uniformly administered . . . standards in order to remain viable"). "In other words, Congress's instructions to [ED] on how to implement the student-loan statutes carry this unmistakable command: Establish a set of rules that will apply across the board." *Chae*, 593 F.3d at 945.

12

52.     In 2010, as part of the Health Care and Education Reconciliation Act, Congress discontinued the FFEL Program in favor of the Direct Loan Program.  Health Care and Education Reconciliation Act, Pub. L. 111-152, § 2201, *et seq.* (Mar. 30, 2010); *see also* 20 U.S.C. § 1071(d).  As a result, no new FFELP Loans could be made after June 30, 2010.

53.     From 1965, when the HEA was enacted, until 2010, when the FFEL Program was terminated, FFELP loans constituted the federal government's principal student loan program. *See* 20 U.S.C. §§ 1071, *et seq.*

54.     Though new FFELP Loans are no longer made, millions of borrowers continue to have—and Federal Guarantors continue to insure or hold—millions of legacy FFELP Loans.

55.     Nothing in the HEA, however, authorizes the States to exercise authority over ED as to regulations of FFELP Loans.

### *Federal Guarantors*

56.     Congress established the role of Federal Guarantors by authorizing the FFEL Program under the HEA.

57.     As ED's Office of Inspector General explains, "[g]uaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the [FFEL Program]." Guaranty Agency Servicer Audits, OIG, U.S. Dep't of Educ., *available at* https://www2.ed.gov/about/offices/list/oig/nonfed/ guaranty.html#:~:text=Guaranty%20agencies%20are%20established%20to,to%20administer%2 0FFEL%20program%20functions.

58.     The HEA provides ED the authority enter into guaranty agreements with guaranty agencies.  *See* 20 U.S.C. § 1078(c) (providing ED this authority and explaining the contents of

13

guaranty agreements and the general mechanics for how guaranty agencies may receive reimbursement from the federal government); 34 C.F.R. § 682.400.

59.    Federal Guarantors thus exercise their role pursuant to federal contracts with ED. *See* 34 C.F.R. § 682.401.

60.    A Federal Guarantor must be either a nonprofit organization or a state agency. 20 U.S.C. § 1078(g); 34 C.F.R. § 682.200 (defining "guaranty agency" as "[a] State or private nonprofit organization that has an agreement with the Secretary under which it will administer a loan guarantee program under the [HEA]").

61.    Each state must have a designated Federal Guarantor, although one Federal Guarantor may serve as the designated guaranty agency for more than one state. *See* C.F.R. § 682.401(b)(7).

62.    The designated guarantor for the Commonwealth of Virginia is ECMC.

63.    There are currently 20 guaranty agencies, most of which are state agencies.

64.    To become a Federal Guarantor, a prospective guaranty agency must apply to enter into guaranty agreements with ED.

65.    Subsections 1078(c)(2) to (3) of the HEA set forth which provisions must be in the guaranty agreements, including that there must be specific provisions governing record retention and reporting as required by ED. *See* 20 U.S.C. § 1078(c)(2)–(3).

66.    Nonprofit organizations also must undertake to meet of all of the requirements in Section 1072(c)(6)(B)(i), (ii), and (iii), such as:

- Agreeing to establish at least one office in the state to handle inquiries from students and lenders, to encourage maximum commercial lender participation, and to conduct periodic visits to at least the major eligible lenders;

14

- Agreeing that its insurance will not be denied any student because of his or her choice of eligible institutions; and

- Certifying that it is neither an eligible institution, nor has any substantial affiliation with an eligible institution.

*See* 20 U.S.C. § 1078(g).

67.     Further, Federal Guarantors must comply with other applicable statutory and regulatory requirements.  *See generally id.* § 1078; 34 C.F.R. § 682.410 (listing fiscal, administrative, and enforcement requirements).

68.     These requirements include being subject to independent audits and oversight. *See* 20 U.S.C. §§ 1078(b)(2)(D)(i) (providing financial and compliance audit requirements for guaranty agencies), 1082(f)(1) (granting ED audit authority over guaranty agencies' financial transactions); 34 C.F.R. §§ 682.414 (detailing records, reports, and inspection requirements for guaranty agencies), 668.24(f)(1)–(3) (detailing examination requirements).

69.     Federal Guarantors are also subject to monthly financial reporting requirements. Ex. 1 (Guaranty Agency Financial Report Guide).

70.     Although not codified in regulations, ED has annual meetings with each Federal Guarantor, where it reviews financials and other concerns.

71.     ED, in turn, publishes guaranty agency reports and public guidance to FFEL Program participants, which include Federal Guarantors.  Federal Student Aid, FFEL Program Lender and Guaranty Agency Reports, *available at* https://studentaid.gov/data-center/lender-guaranty; Federal Student Aid, Federal Family Education Loan (FFEL), *available at* https://fsapartners.ed.gov/knowledgecenter/library/program/Federal%20Family%20Education%20Loan%20%28FFEL%29 (providing links to access FFEL Program publications).

15

72.     As a result, guaranty agency reporting is public and transparent, as is ED's guidance to the FFEL Program participants.

73.     If Federal Guarantors do not comply with the HEA and its regulations, ED has authority to level civil penalties, 20 U.S.C. § 1082(g), or even revoke guarantor status, *id.* § 1078(c)(9)(E).

## Federal Guarantors' Role in the FFEL Program

74.     Federal Guarantors play a pivotal role in the FFEL Program, including before a loan defaults[10] and after the guaranty obligation matures.

75.     They specifically help ED administer the FFEL Program by providing college access, financial literacy, and default aversion assistance to FFEL lenders, students, and institutions of higher education.

76.     In carrying out these tasks, guaranty agencies are fulfilling their obligations as a contractor—and fiduciary—to ED. *See* 34 C.F.R. § 682.419(a) ("The guaranty agency must exercise the level of care required of a fiduciary charged with the duty of protecting, investing, and administering the money of others"); *see also Pelfrey v. Educ. Credit Mgmt. Corp.*, 208 F.3d 945 (11th Cir. 2000); *Bennett v. Premiere Credit of N. Am., LLC*, 504 Fed. Appx. 872, 878 n.4 (11th Cir. 2013) (holding that the Fair Debt Collection Practices Act does not apply to a guaranty agency because "(1) it has a fiduciary relationship with [ED] and (2) its collection activities are incidental to that fiduciary obligation").

---

[10] For purposes of the FFEL Program, a "default" only occurs if the Secretary of ED or guaranty agency finds it reasonable to conclude the borrower no longer intends to honor his or her obligation to repay and the failure persists for 270 days. *See* 34 C.F.R. § 682.200(b).

77.     As described above, ED, in turn, regularly audits Federal Guarantors to ensure that they are in compliance with all regulations. *See* 34 C.F.R. §§ 682.410(b), 682.414(c).

78.     Federal Guarantors provide financial aid outreach to student loan borrowers and develop high-quality financial management programs that address debt management and financial literacy. *See, e.g.,* 20 U.S.C. § 1083a(a) (requiring Federal Guarantors to "develop and make available high-quality educational programs and materials to provide training for students and families in budgeting and financial management, including debt management and other aspects of financial literacy"); *see also id.* § 1072b (permitting Federal Guarantors to use agency operating funds to engage in "school and lender training, financial aid awareness and related outreach activities, . . . and other student financial aid related activities").

79.     Federal Guarantors also assume loans in instances other than default, including when student loan borrowers have pending bankruptcies. *See id.* § 1087; 34 C.F.R §682.402(f)

80.     Federal Guarantors further engage in default aversion activities aimed at helping delinquent student loan borrowers avoid default. 20 U.S.C § 1078(l)(1) ("Upon receipt of a complete request from a lender received . . . *a guaranty agency having an agreement with the Secretary under subsection (c) shall engage in default aversion activities* designed to prevent the default by a borrower on a loan covered by such agreement." (emphasis added)).

81.     These activities include providing financial-literacy resources, mediating calls between borrowers and Servicers to resolve issues, counseling borrowers on their rights and obligations, and conveying to borrowers the importance of avoiding default.

17

82.     Federal Guarantors specifically counsel borrowers on avoiding default by providing them with educational resources to help them understand their rights and make informed decisions when repaying their loans.

83.     Although Guarantors' default aversion counseling is limited to when a student loan borrower is delinquent on his or her loan as specified under the HEA, this work is critically important in helping borrowers avoid default and all its collateral consequences—including credit reporting, collection fees, and Title IV loan ineligibility.

84.     Federal Guarantors also play a role when a FFELP Loan enters default.

85.     When a student loan borrower is delinquent for at least 270 days[11] (when repayable in monthly installments), the FFELP Loan is in default, and a lender then has 90 days to submit a default claim to its Federal Guarantor.  20 U.S.C. § 1085(l); 34 C.F.R. § 682.406(a)(5).

86.     Once a lender makes a default claim, Federal Guarantors are required by federal law to engage in numerous activities.

87.     They first must vet the qualifying lender's default insurance claims and verify that the lender has satisfied numerous "due diligence" and other requirements for obtaining FFEL Program insurance, including asking the respective Federal Guarantor to engage in mandated "default aversion" activities.  34 C.F.R. § 682.406(a).

88.     They then must pay the lender using money from a Federal Student Loan Reserve Fund that is the "property of the United States" and that they hold in trust as a fiduciary, and

---

[11] Some of the guaranty agreements with ED have a "litigation waiver" that allows submission of a claim later than 270 days if certain requirements are met.

assume the defaulted loans.  20 U.S.C. § 1078(c)(2)(A); 34 C.F.R. §§ 682.406(a), 682.419(a), (c)(1).

89.     Within 45 days of paying the lender's claims, Federal Guarantors must: (i) send the defaulted borrower a notice that demands repayment and otherwise informs the borrower of his or her obligations, options, and rights, 34 C.F.R. §§ 682.410(b)(5)(vi)(D),(b)(6)(ii); and (ii) provide the borrower with a 60-day debt substantiation period to verify and challenge the amount due through a process that includes an administrative hearing if the borrowers seeks it,  *id.* § 682.410(b)(5)(ii)-(iv).  To locate each borrower, Federal Guarantors must engage in skip-tracing. 20 U.S.C. § 1078(c)(2)(G); 34 C.F.R. § 682.406(a)(14).

90.     After the 60-day period for the borrower to administratively challenge the default elapses (or after an administrative challenge is denied), Federal Guarantors must engage in additional activities, such as credit reporting and, if borrowers have not made payment arrangements, tax-offsets and wage-garnishment. *See, e.g.*, 20 U.S.C. § 1091a(b)(2) (preempting state limitations on guarantor attempts to collect on defaulted FFELP Loans through litigation, offset, garnishment, or other action); *id.* § 1095a (authorizing guarantors to garnish wages of defaulted borrowers); 31 U.S.C. § 3720A(a) (authorizing third parties acting as agents of the federal government to seek tax offsets where the federal agency is owed a past-due legally enforceable debt); *see also* 34 C.F.R. § 682.410(b)(6)(ii), (v)-(vii).

91.     Only if the Federal Guarantor is unable to get the loan back in repayment status does it obtains reinsurance from, and transfers the loan to, ED.  *See* 34 C.F.R. § 682.404.

92.     Indeed, federal law specifically directs Federal Guarantors to educate student loan borrowers "before, during, and after the students' enrollment in an institution of higher

education."  20 U.S.C. § 1083a (explaining that these services include financial-literacy resources, mediating calls between borrowers and Servicers to resolve issues, counseling borrowers on their rights and obligations, and conveying to borrowers the importance of avoiding default).

93.     The federal government's interest in and oversight over the FFEL Program was recently underscored by ED's March 30, 2021 issuance of Dear Colleague Letter ("DCL") GEN-21-03, which extended certain COVID-19 emergency flexibilities to FFELP Loans.  In DCL GEN-21-03, ED, among other things, required Federal Guarantors to suspend collections, refund payments, and assign certain loans they held to ED.

94.     Since 2014, NASLA's member ECMC has helped 107,899 borrowers avoid default on $1.8 billion in outstanding student loans, which has resulted in the avoidance of $466 million in federally mandated collections costs under 34 C.F.R. § 682.410.

### Federal Guarantors Do Not Service Student Loans

95.     Federal Guarantors are distinct from Servicers of federal student loans because they do not service student loans.

96.     Although Federal Guarantors work directly with borrowers as part of their mandated default-aversion activities, they do not engage in traditional loan servicing activity before paying default or other claims and assuming FFELP Loans as ED's fiduciary.  Among other things, Federal Guarantors do not engage in the following activities before assuming FFELP Loans:

- Receiving scheduled periodic payments from student loan borrowers;
- Receiving notifications that a borrower made a scheduled periodic payment;

20

- Applying payments to the borrower's account pursuant to the terms of the student loan or the contract; or

- During a period when no payment is required on a student loan, maintaining account records for the student loan or communicate with borrowers regarding the student loan on behalf of the lender.

97.    This traditional loan servicing activity — which is also dictated by federal law for Servicers of federal student loans—is therefore separate and distinct from Federal Guarantors' federally-mandated default-aversion and financial-wellness work.

98.    The servicing activity performed by Servicers of federal student loans is concurrent to the supplemental default-aversion services Federal Guarantors perform before default.

99.    Therefore, to accomplish FFELP's goal of providing students with access to loans while bypassing the limits of traditional loan underwriting, the federal government settled on a guaranty model that expressly sanctions the activity of Federal Guarantors as distinct from Servicers.

### Federal Government Compensation to Federal Guarantors

100.    Federal Guarantors do not receive compensation from borrowers, Servicers, or lenders under the FFEL Program.

101.    The FFEL Program covers the cost of the work performed by Federal Guarantors according to a fee schedule enumerated in federal law. *See* 20 U.S.C. § 1078(b); 34 C.F.R. § 682.404.

102.    Pursuant to the terms of the FFELP Loans, Federal Guarantors receive a 1 percent default fee that is collected from each disbursement on a FFELP Loan. This amount

21

compensates the Federal Guarantor for its work and is designed to cover the costs of insuring the loan if the borrower defaults.

103.    Some Federal Guarantors waive the default fee for borrowers.

104.    Federal Guarantors also receive fees for collection and account maintenance.

105.    If a borrower defaults on a FFELP Loan, the private lender can file a default claim with the loan's Federal Guarantor, which has to purchase the loan's balance after verifying to ensure the lender performed proper due diligence.  The federal government will reimburse a Federal Guarantor up to 100 percent of the purchase amount if the federal government determines that the Federal Guarantor satisfied its due diligence requirements to prevent the default.

106.    Even if a Federal Guarantor is reimbursed, the agency is responsible for collecting on the defaulted loan with the goal to have the borrower rehab the loan or repay it under satisfactory repayment terms.

### The Act

107.    Last year, Virginia enacted the Act by passing House Bill 10 and Senate Bill 77.

108.    The Act is codified at Virginia Code Annotated §§ 6.2-2600 to 2622 (2020).

109.    The Act went into effect on July 1, 2021.

110.    The Act's stated purpose, as reflected in its title, is to regulate "Qualified Education Loan Servicers."

111.    It imposes registration, licensing, and oversight requirements on companies engaged in the "servicing" of student loans in Virginia.

112.    The Act defines "servicing" to include "interacting with a qualified education loan borrower, including conducting activities to help prevent default on obligations arising from qualified education loans or to facilitate any activity [of traditional loan servicing]." Va. Code Ann. § 6.2-2600.

113.    It further defines "qualified education loan servicer" or "loan servicer" as any person, wherever located, that "interacts with a qualified education loan borrower, which includes conducting activities to help prevent default on obligations arising from qualified education loans or to facilitate any activity [of traditional loan servicers]." *Id.*

114.    The Act thus expands the definitions of "servicing" and "student loan servicer" beyond their traditional understandings.

115.    As a result, there are many types of organizations and entities that do not service student loans but are covered by the Act.

116.    For example, the Act purports to regulate Federal Guarantors because of the default-prevention and financial-wellness activities they perform.

117.    The Act also significantly changes the regulatory landscape of student loans in Virginia.

118.    It bars anyone from acting as a "qualified education loan servicer, directly or indirectly . . . except in accordance with the provisions of this chapter and without having first obtained a license under this chapter from the Commission." *Id.* § 6.2-2601.

119.    There are only a few exceptions to the licensure application process.

120.    Subsection 6.2-26-2(A) includes an exemption from the application process if the Commissioner of Financial Institutions for the Bureau (the "Commissioner")[12] determines that the person "(i) has an agreement with the U.S. Secretary of Education under 20 U.S.C. § 1078(b), solely to the extent of the person's actions as a guarantor that engages in averting defaults, or (ii) is a party to a contract awarded by the U.S. Secretary of Education under 20 U.S.C. § 1087f." *Id.* § 6.2-2602(A).

121.    The Commissioner automatically issues a license or renews the license for those deemed exempt. *Id.* § 6.2-2602(B).

122.    Those exempt from the licensure application process, however, are not exempt from licensure itself.

123.    All subject to licensure must pay an annual license fee and provide a surety bond of between $50,000 and $500,000. *See id.* §§ 6.2-2602(B)(1)-(2), 2604, 2614.

124.    This includes those exempt from the licensure application process because payment of the annual license fee and provision of the surety bond is a prerequisite for the automatic issuance of the license.

125.    Once licensed, the Act also subjects all "qualified education loan servicers" (*i.e.*, "licensees"), including those exempt from the licensure application process, to broad regulatory oversight.

126.    Licensees are subject to investigation and examination by the Commission at least once every three years. *See id.* § 6.2-2613.

---

[12] The Commissioner is currently Defendant Face.

127.    The Act also directs all licensees to maintain books, accounts, and records as the Commissioner may reasonably require, including "maintain[ing] adequate records of each qualified education loan transaction for at least three years after final payment is made on such loan or the assignment of such qualified education loan, whichever occurs first." *See id.* § 6.2-2608(A).

128.    The Bureau may request a written response, books, records, documentation, or other information from licensees in connection with the Bureau's investigation, enforcement, or examination of compliance with the Act and other applicable laws. *See id.* § 6.2-2608(C).  A licensee must deliver a written response, as well as any requested books, records, documentation, or information, within the time period specified in the Bureau's request. *Id.*

129.    Although the Act does not permit the Commission to issue an order to temporarily or permanently prohibiting or barring those exempt from the licensure application process from operating in Virginia, the Act specifically gives the Commission the power to issue cease and desist orders and enjoin those exempt. *See id.* § 6.2-2602(E)–(F).

130.    The Commission specifically has the power to, among others, issue cease and desist orders, *id.* § 6.2-2617; impose civil penalties of up to $2,500 per violation, *id.* § 6.2-2618; and investigate and enjoin "qualified education loan servicers" for violating the Act, *id.* § 6.2-2620.

131.    The Act also provides a private cause of action to obtain damages (including treble damages), restitution, injunctions, attorneys' fees, and other relief against "qualified education loan servicers." *Id.* § 6.2-2618.

25

132.    Therefore, although the Act does not permit the Commission to revoke the licenses of those exempt from the licensure application process, the Act gives the Commission the power to enjoin, fine, issue cease and desist orders, investigate, require annual fees and surety bonds, and otherwise regulate licensees, including Federal Guarantors.

133.    As a result, the Commission is able to dictate how Federal Guarantors operate in Virginia and effectively prevent them from operating in the Commonwealth if the Commission so chooses.

### Legislative Outreach

134.    Before the Act passed and became law, NASLA members actively participated in the legislative process, noting their concerns with House Bill 10's and Senate Bill 77's arguably ambiguous definitions of "servicing," "qualified education loan servicer," and "loan servicer."

135.    NASLA member ECMC contacted key legislators, including the sponsors, of House Bill 10 (and Senate Bill 77), the Governor's office, and the Attorney General's office regarding the "servicing" and "qualified education loan servicer" definitions and the potential preemption problems if Federal Guarantors were included in the bill.

136.    In response, ECMC was told that any remaining ambiguity would best be resolved through implementing regulations from the Commission.

### Efforts to Confer with the Commonwealth of Virginia

137.    After the Act was signed into law, NASLA joined ECMC's efforts and engaged in outreach on behalf of all its members concerning the Act's applicability to Federal Guarantors.

138.    On February 2, 2021, counsel for NASLA wrote to Commissioner Face to express NASLA's concerns with the Act. *See* Ex. 2 (Letter to Commissioner Face).

26

139.     The letter specifically requested that the implementing regulations that the Commission adopt abide by federal law and clarify that Federal Guarantors are exempt from the Act's requirements. *Id.*

140.     The letter also requested a written interpretation that the Act will not apply or be enforced against Federal Guarantors in light of the significant adverse effects it would have on Federal Guarantors, including NASLA's members, and the clear illegality of imposing its provisions on Federal Guarantors. *Id.*

141.     On March 8, 2021, Commissioner Face, on behalf of the Bureau, responded via letter. *See* Ex. 3 (Response Letter from Commissioner Face).

142.     As to whether the Act applies to Federal Guarantors or runs afoul of federal law, Commissioner Face stated that the Bureau "does not issue written interpretation of the law on behalf of the Commonwealth of Virginia." *Id.*

143.     Mr. Face then welcomed NASLA's participation and comments on any proposed regulations during the forthcoming rulemaking process. *Id.*

144.     On March 9, 2021, the Commission issued an Order to Take Notice (the "Order") that the Bureau has submitted to the Commission proposed regulations to implement the provisions of the Act in Case No. BFI-2021-00007. *See* Ex. 4 (Order).

145.     The Order specified that the proposed regulations establish, among other things, "the amount required for the surety bond, annual reporting requirements, the procedure for documenting eligibility for automatic issuance of a license, the application and renewal process, the annual fee schedule, and procedures for submitting information to the Bureau." *Id.*, at 1.

146.    The Order attached the proposed regulations (titled "Qualified Education Loan Servicers" and adding 10 Va. Admin. Code § 5-220-10 through 90). *Id.*, at 3-8.

147.    The proposed regulations provided surety bond standards, including specifying that each licensee file with the Commissioner a surety bond of between $50,000 and $500,000, as dictated by the Commissioner. *Id.* § 5-220-20 (surety bond).

148.    The proposed regulations also required each licensee, even if exempt from the licensure application process, to pay an annual fee of $1,000 per licensee, plus $0.48 per qualified education loan serviced by the licensee. *Id.* § 5-220-80.

149.    The proposed regulations further required that licensees maintain in their principal place of business all books, accounts, and records, *id.* § 5-220-50; respond to requests from the Bureau for a written response, books, records, documentation, or other information, *id.* § 5-220-60; and file an annual written report with the Commissioner containing information the Commissioner may require concerning the licensee's business and operations, *id.* § 5-220-70.

150.    The proposed regulations did not exempt Federal Guarantors, or any other licensee, from paying the annual licensing fee, posting a surety bond, or complying with the Commission's regulatory oversight, including the requests for records and other information.

151.    The Order made comments to the proposed regulations due on or before April 16, 2021. *Id.*, at 2.

152.    NASLA submitted comments to the proposed regulations on April 16, 2021. *See* Ex. 5 (NASLA comments).

153.    In the comments, NASLA reiterated that the Act, and now the proposed regulations, would present legal and practical issues. *Id.*

28

154.   NASLA also provided section-by-section comments regarding why Federal Guarantors should be exempt from the proposed regulations and why the Commission should otherwise not enforce the proposed regulations against them.  *Id.*

155.   The Bureau responded to NASLA's comments on May 17, 2021.[13]  *See* Ex. 6 (Response to Comments).

156.   Although the Bureau recommended slight changes in language to various provisions in the proposed regulations based on others' comments, the Bureau declined to amend the proposed regulations to address NASLA's comments.  *Id.*

157.   The Bureau also declined to recommend that Federal Guarantors be exempt from the proposed regulations and did not otherwise address NASLA's arguments that the proposed regulations are preempted by federal law and barred under the doctrine of intergovernmental immunity.  *Id.*, at 7–8.

158.   The Bureau specifically stated that "exemptions such as those sought by NASLA . . . cannot be provided through this rulemaking" and then "recommend[ed] that the Commission not consider the issues of federal preemption and intergovernmental immunity in the context of this proceeding."  *Id.* at 8.

159.   NASLA also requested a virtual meeting and met with the Bureau on May 24, 2021.

160.   At the meeting, the Bureau was represented by, among others, Commissioner Face, Deputy Commissioners Dustin Physioc and Susan Hancock, and legal counsel.

---

[13] The Bureau, however, did not provide a copy of its responses to NASLA directly but rather posted them online without any notice to NASLA other than referencing them at the May 24, 2021 meeting.

29

161.    The Bureau represented that because it had already responded to NASLA's comments, it would listen to NASLA but take no action.

162.    After listening to NASLA's concerns, the Bureau stated that no other response to NASLA's comments will be provided and that it stands by its responses, but that the matter is before the Commission.

163.    The Bureau also represented that it and the Commission do not have the authority to promulgate and adopt regulations contrary to the Act.

164.    Based on the Bureau's responses and representations, and the Commission's imminent adoption of the proposed regulations, NASLA has no choice but to assume that the Act and its implementing regulations apply to its members and that the Commission, the Bureau, and the Commissioner plan to enforce them against Federal Guarantors.

*The Act and its Implementing Regulations Have and Will Continue to Cause NASLA's Members Immediate and Significant Hardship*

165.    Because the Act and its implementing regulations impose significant regulations on Federal Guarantors, they have and continue to cause NASLA's members immediate and significant harm.

166.    Federal Guarantors have already expended significant resources interacting with the Commission, the Bureau, and other branches of Virginia's government to obtain an answer on whether the Act and its implementing regulations apply to Federal Guarantors' activity in Virginia and to explain why applying them to Federal Guarantors would violate federal law.

167.    Moreover, the annual licensing fee and surety bond burdens Federal Guarantors who have smaller portfolio of borrowers in Virginia.

30

168.   For example, one Federal Guarantor, who is also a NASLA member, has only 84 non-default bowers who have Virginia addresses.

169.   The annual nonrefundable licensing fee would be a burden by itself, but that is only one aspect of the burden.

170.   But perhaps the biggest cost now is the uncertainty and likely burden resulting from the Commission's and the Bureau's new regulatory powers—including the possibility of audits, cease and desist orders, injunctions, and findings that potentially would be in contradiction with ED oversight.

171.   The uncertainty is not paranoid.  It is informed by concrete examples from other states that have affirmatively sought to compel Servicers of federal student loans to comply with examination requests and regulatory oversight.  *See Pa. Higher Educ. Assistance Agency v. Perez*,  457 F.Supp.3d 112 (D. Conn. 2020);  *California v. Pa. Higher Educ. Assistance Agency*, Case No. 20-cv-03150-MMC (N.D. Cal. Oct. 2, 2020); *Martha Fulford, Administrator, Uniform Consumer Credit Code v. Pa. Higher Educ. Assistance Agency d/b/a Fedloan Servicing*, filed May 26, 2021, *available at* https://coag.gov/app/uploads/2021/05/2021-05-26-PHEAA-Complaint.pdf.

172.   Though there is some base level of statutorily-required activities Federal Guarantors could be unable to stop doing in Virginia (without running afoul of ED, the HEA, and the implementing regulations), the cost and uncertainty will likely cause some Federal Guarantors to stop or significantly curtail the financial-wellness, college-access, and other operations in Virginia to the extent they can—either transitioning them entirely to other states or

at least redirecting some resources currently devoted to financial-wellness initiatives to cover increased uncertainty and costs of compliance.

173.    This chilling effect will not only touch Federal Guarantors.  The Act and implementing regulations could be read to apply to financial-wellness activities by anyone— from a financial-aid officer to a social worker to a legal-aid attorney—who "interacts" with a student loan borrower about student loans.  There is no principled way to read the Act and implementing regulations otherwise.

174.    And, ultimately, borrowers and prospective students will suffer the most if college-access and financial-wellness activities are chilled and curtailed in Virginia; in complete contravention of the animating purposes of both the HEA and the Act.

## FIRST CLAIM FOR RELIEF
(Declaratory Judgment that Federal Law Preempts the Act and its Implementing Regulations under the *Leslie Miller* Rule)

175.    NASLA incorporates and re-alleges the allegations contained in paragraphs 1 through 175 of this Complaint as if fully set forth herein.

176.    Application of the Act and its implementing regulations to Federal Guarantors is preempted by federal law.

177.    State licensing requirements are preempted and cannot be enforced when they "give 'the State's licensing board a virtual power of review over the federal determination' that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress."  *Sperry v. Florida ex rel. The Fla. Bar*, 373 U.S. 379, 385 (1963) (quoting *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956)).

32

178.    States may not subject federal actors to state licensing requirements, and specifically state officers may not require federal actors to "desist from performance [of their federal duties] until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on." *Leslie Miller*, 352 U.S. at 190 (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)); *see also Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 439-40 (9th Cir. 1991) (reasoning *Leslie Miller* rule applies regardless of whether state licensing scheme presents condition precedent to obtaining federal contract or does not require compliance until after federal contract has been awarded in stating that "interference occurs when . . . the state requires a contractor with the federal government to comply with its licensing laws even if that requirement is not enforced until after performance has begun").

179.    If applied to Federal Guarantors, the Act and its implementing regulations would require these guarantors to obtain a license from Virginia for permission to perform their commitments under federal law and would obligate them to pay Virginia an annual fee of $1,000 a year, plus $0.48 per qualified education loan serviced, to comply with the implementing regulation.

180.    The Act and its implementing regulations also would subject Federal Guarantors to investigations (*i.e.*, searches) of their places of business and effects at the discretion of the Commission and the Bureau, the seizure of their records on demand of the administrator, and to investigative fees for these searches and seizures; effectively requiring Federal Guarantors to forfeit their Fourth Amendment rights to perform their statutory, regulatory, and contractually-defined role as ED's fiduciary.

33

181.    The Act and its implementing regulations would further provide the Commission and the Bureau discretion to decide when a Federal Guarantor has violated the Act, and then permit the Commission and the Bureau to, among other things, issue cease and desist orders, file civil actions, issue injunctions, and impose civil penalties of up to $2,500 per violation.

182.    In short, the Act gives the Commission and the Bureau the oversight power to decide how Federal Guarantors do their jobs and if they are competent.

183.    As a result, the licensure scheme established by the Act and its implementing regulations is preempted under the *Leslie Miller* rule.

184.    An actual and justiciable controversy presently exists concerning, among other issues, the legality and enforceability of the Act and its implementing regulations.

185.    A declaration as to the legality and enforceability of the Act and its implementing regulations would terminate the uncertainty giving rise to this proceeding.

186.    Therefore, NASLA is entitled to a judicial determination pursuant to 28 U.S.C. § 2201, *et seq*., and Rule 57 of the Federal Rules of Civil Procedure that federal law preempts the Act and its implementing regulations, and that the Commission, the Bureau, and Virginia, through the Commissioner and the Commissioners for the Commission, have no power to enforce the Act and its implementing regulations because they are preempted under the rule established in *Leslie Miller*.

## SECOND CLAIM FOR RELIEF
(Declaratory Judgment that that the Act and its Implementing Regulations Violate the Fourth and Fourteenth Amendments to the U.S. Constitution)

187.    NASLA incorporates and re-alleges the allegations contained in paragraphs 1 through 187 of this Complaint as if fully set forth herein.

34

188.    The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment applies to the States through the Fourteenth Amendment to the U.S. Constitution.

189.    The Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial businesses and extends to "administrative inspections designed to enforce regulatory statutes." *New York v. Burger*, 482 U.S. 691, 699–700 (1987).

190.    The Fourth Amendment limits the manner in which the government may conduct inspections of business records. Administrative searches generally require warrants. *Michigan v. Clifford*, 464 U.S. 287, 291–92 (1984). For instance, when an agency subpoenas books or records, "the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *See v. City of Seattle*, 387 U.S. 541, 544 (1967).

191.    The Act and its implementing regulations violate Federal Guarantors and student loan borrowers' right to be free from unreasonable and warrantless searches and seizures.

192.    Federal Guarantors have a reasonable expectation of privacy in their business records and information. Similarly, student loan borrowers have a reasonable expectation of privacy in the personal information they provide regarding their student loans.

193.    The Act and its implementing regulations implicate the Fourth Amendment because they authorize a search and seizure regime that intrudes on protected privacy interests of Federal Guarantors and student loan borrowers. *See Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 486 (S.D.N.Y. 2019).

35

194.    The Act and its implementing regulations require licensees to deliver "books, records, documentation, or other information" to the Bureau in connection with any Bureau investigation, enforcement, or examination of compliance with the Act.  Va. Code Ann. § 6.2-2608(C); *see also* Ex. 4, § 5-222-60(B).

195.    Before a records request is made, the Act and its implementing regulations do not require the Bureau to obtain a warrant, subpoena, or any other proper legal process to seize books, records, documentation, or other information from licensees.  *See id.*

196.    The Act and its implementing regulations thus allow the Bureau to arbitrarily determine whether licensees must turn over books, records, documentation, or other information to the Bureau.  There is no requirement for individualized suspicion or probable cause.  Under the Act and its implementing regulations, the Bureau has unlimited discretion to decide when a licensee must turn over their records, documents, and information and what  a licensee must relinquish.

197.    The Act and its implementing regulations do not require that the Bureau's requests for records be limited in scope, relevant in purpose, or specific in directive such that compliance will not be unreasonably burdensome for licensees.

198.    If a licensee refuses to comply with the Bureau's request for books, records, documentation, or other information, the Commission is authorized to, *inter alia*, issue a cease and desist order or an injunction pursuant to Section 2602(F) of the Act, or impose a civil penalty upon a licensee under Section 2615 of the Act.  Va. Code Ann. §§ 6.2-2602(F), 2615.

199.    Because of these enforcement mechanisms, Federal Guarantors have no choice but to either submit to the searches and seizures or risk being unable to comply with their federal contracts as to their Virginia portfolios.

200.    In other words, by requiring that Federal Guarantors be licensed in order to operate in Virginia and imposing consequences, including cease and desist orders and injunctions, for noncompliance with the accompanying regulatory scheme, the Act and its implementing regulations force Federal Guarantors to consent to the Bureau's inspection of their books, records, documentation, and other information, including the personal files of student loan borrowers maintained by Federal Guarantors.

201.    As alleged above, federal law preempts the Act and the implementing regulations under *Leslie Miller*, and thus Virginia lacks the power to impose its licensing scheme upon Federal Guarantors.

202.    Therefore, as to Federal Guarantors, searches and seizures pursuant to the Act and implementing regulations are unreasonable.

203.    Because the Fourth Amendment does not permit the government to coerce consent, the Act's requirement that Federal Guarantors consent to unreasonable searches and seizures of their confidential business records is unconstitutional. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973) (holding that the Fourth and Fourteenth Amendments require that the government demonstrate that consent to a search was "voluntarily given, and not the result of duress or coercion, express or implied").

204.    An actual and justiciable controversy presently exists concerning, among other issues, the legality and enforceability of the Act and its implementing regulations.

37

205.    A declaration as to the legality and enforceability of the Act and its implementing regulations would terminate the uncertainty giving rise to this proceeding.

206.    Therefore, NASLA is entitled to a judicial determination pursuant to 28 U.S.C. § 2201, *et seq*., and Rule 57 of the Federal Rules of Civil Procedure that the Act and its implementing regulations violate the Fourth Amendment to the U.S. Constitution, as applied through the Fourteenth Amendment, and that the Commission, the Bureau, and Virginia, through the Commissioner and the Commissioners for the Commission, have no power to enforce the provisions in the Act and its implementing regulations requiring Federal Guarantors to provide "books, records, documentation, or other information" to the Bureau.

### THIRD CLAIM FOR RELIEF
(Declaratory Judgment that Federal Guarantors Are Immune from Compliance with the Act and its Implementing Regulations under Intergovernmental Immunity)

207.    NASLA incorporates and re-alleges the allegations contained in paragraphs 1 through 207 of this Complaint as if fully set forth herein.

208.    The U.S. Supreme Court first articulated the intergovernmental-immunity doctrine when it held that, under the Supremacy Clause, "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *M'Culloch v. Maryland*, 17 U.S. 316, 317 (1819).

209.    The doctrine forecloses state attempts to (1) directly tax or regulate the activities of the federal government, or (2) to discriminate against the federal government and those with whom it deals. *See Phillips Chemical Co. v. Dumas Ind. School Dist.*, 361 U.S. 376, 387 (1960) (holding that a Texas statute permitting school districts to tax lessees of federal land but not

38

lessees of state land is invalid under intergovernmental immunity doctrine); *North Dakota v. United States*, 495 U.S. 423, 435 (1986) (holding that state regulation is invalid if it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals").

210.    A state's attempt to regulate a federal government contractor in the performance of its contract is a direct attempt to regulate the federal government. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988) ("[A] federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor"); *Boeing Co. v. Movassaghi*, 786 F.3d 832, 840 (9th Cir. 2014) (holding that a state environmental cleanup bill directly regulates the federal government where it effectively "replaces the federal cleanup standards that Boeing has to meet to discharge its contractual obligations to [the Department of Energy]").

211.    Furthermore, where a state enactment imposes a heavier burden on those who deal with the federal government than is imposed on those who do not deal with the federal government, this difference "must be justified by significant differences between the two classes." *Phillips Chemical Co.*, 361 U.S. at 383.  Inconsistent treatment of the federal government will be invalid discrimination unless it is both "directly related to, *and* justified by 'significant differences between the two classes.'" *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 816 (1989) (quoting *Phillips Chemical Co.*, 361 U.S. at 383) (emphasis added).

212.    The intergovernmental-immunity doctrine thus invalidates state regulation where, absent express Congressional authorization for the state interference, it either directly regulates a

federal contractor performing its duties or unjustifiably discriminates against the federal contractor.

213.     The Act and its implementing regulations purport to dictate how Federal Guarantors do their job pursuant to federal contracts.

214.     The Act and its implementing regulations require Federal Guarantors to, among other things, be subject to investigation and examination by the Commission at least once every three years—which includes the Commission's and the Bureau's power to, among others, issue cease and desist orders, impose civil penalties of up to $2,500 per violation, and investigate and enjoin Federal Guarantors from violating the Act and implementing regulations.

215.     The Act's requirements violate the intergovernmental-immunity doctrine because they are an attempt by the Virginia to regulate—and to interfere in—the activities of the federal government by mandating that its contractors—Federal Guarantors—perform their jobs not as the federal government would have them do so, but rather according to the state's preferences.

216.     The Act's requirements as applied to Federal Guarantors thus directly interfere with the functions of the federal government by mandating how they "render[] services that the federal government hired [the contractor] to make." *See Boeing Co.*, 768 F.3d at 840.

217.     Congress has not authorized this regulation of Federal Guarantors.

218.     An actual and justiciable controversy presently exists concerning, among other issues, the legality and enforceability of the Act and its implementing regulations.

219.     A declaration as to the legality and enforceability of the Act and its implementing regulations would terminate the uncertainty giving rise to this proceeding.

40

220.    Therefore, NASLA is entitled to a judicial determination pursuant to 28 U.S.C. §
2201, *et seq*., and Rule 57 of the Federal Rules of Civil Procedure that Federal Guarantors are
immune under the intergovernmental-immunity doctrine from compliance with the Act and its
implementing regulations, and that the Commission, the Bureau, and Virginia, through the
Commissioner and the Commissioners for the Commission, have no power to enforce the Act
and its implementing regulations against them.

### **PRAYER FOR RELIEF**

WHEREFORE, NASLA respectfully requests that the Court issue:

a.   a declaratory judgment that federal law preempts the Act and its implementing

regulation, and the Commission, the Bureau, and Virginia, through the

Commissioner and the Commissioners for the Commission, have no power to

enforce them against Federal Guarantors;

b.   a declaratory judgment that the Act and its implementing regulations violate the

Fourth Amendment to the U.S. Constitution, as applied through the Fourteenth

Amendment, and that the Commission, the Bureau, and Virginia, through the

Commissioner and the Commissioners for the Commission, have no power to

enforce the provisions in the Act and its implementing regulations requiring

Federal Guarantors to provide "books, records, documentation, or other

information" to the Bureau;

c.   a declaratory judgment that Federal Guarantors are immune from complying with

the Act and its implementing regulations under the intergovernmental-immunity

doctrine, and the Commission, the Bureau, and Virginia, through the

41

Commissioner and the Commissioners for the Commission, have no power to

enforce them against Federal Guarantors;

d.   an order permanently enjoining Defendants from enforcing the Act and its

implementing regulations against Federal Guarantors; and

e.   such other and further relief as may be provided by law or as the Court may deem

equitable.


Respectfully submitted this 8th day of July 2021.



BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:   *s/ Joshua A. Weiss*
_____

Joshua A. Weiss, VA Bar No. 82789
Christopher O. Murray (pro hac vice forthcoming)
David B. Meschke (pro hac vice forthcoming)
410 17th Street, Suite 2200
Denver, CO 80202
Telephone:  303.223.1100
Fax:  303.223.1111
Email:  jweiss@bhfs.com;
           cmurray@bhfs.com;
           dmeschke@bhfs.com


*Attorneys for Plaintiff National Association of Student*
*Loan Administrators*


Plaintiff Address:
2501 International Lane
Madison, Wisconsin 53704